| | |
|---|---|
| HARLEY-DAVIDSON MOTOR COMPANY, INC., <br><br>         Plaintiff, <br><br>    vs. <br><br> MOD JEWELRY GROUP, INC., LEN WEISS, and STEEL HORSE JEWELRY INC., <br><br>         Defendants. | Case No. 2:24-cv-1125 <br><br> **COMPLAINT FOR BREACH OF CONTRACT, TRADEMARK COUNTERFEITING, TRADEMARK INFRINGEMENT, TRADEMARK DILUTION, AND COPYRIGHT INFRINGEMENT** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Harley-Davidson Motor Company, Inc. ("Harley-Davidson," "H-D," or "Plaintiff"), by its undersigned attorneys, brings this action against Defendants MOD Jewelry Group, Inc. ("MOD"), Len Weiss ("Weiss"), and Steel Horse Jewelry Inc. ("Steel Horse") (collectively, "Defendants") and alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters:

### NATURE OF THE ACTION

1.      This is a dispute about a former Harley-Davidson licensee's breach of its contractual obligations and infringement of H-D's trademark and copyright rights, and its attempts to avoid liability for those acts.

2.      H-D is a world-famous manufacturer of motorcycles and offers and sells a wide variety of other products and services in connection with its famous trademarks including, but not limited to, HARLEY-DAVIDSON, HARLEY, H-D, HD, its Bar & Shield Logos, its Willie G. Skull Logo, and various marks including eagles and/or wings (the "H-D Marks").

3.      For many years, MOD Jewelry, Inc. was a licensee for H-D pursuant to a license agreement signed by both parties (the "License Agreement"). In exchange for allowing MOD to use the H-D Marks in connection with jewelry and other related goods (such as riding bells), MOD was required to make quarterly royalty payments to H-D.

4.      Among other obligations, MOD agreed not to sell any goods to H-D dealers during the term of, and for two years after the expiration of, the License Agreement.

5.      H-D and MOD periodically mutually renewed their License Agreement for specified periods of time. Most recently, in December 2022, H-D and MOD agreed to renew the agreement for the period of January 1, 2023 to December 31, 2023.

6.      A few months into the 2023 term, Defendants registered the domain name steelhorsejewelry.com and incorporated a new business called Steel Horse Jewelry Inc. On information and belief, Defendants intended not to continue making royalty payments in the event that H-D chose not to renew the License Agreement, and created the Steel Horse entity to evade liability.

7.      In October 2023, H-D told Defendants by telephone and follow-up email that H-D did not intend to renew the License Agreement and reminded Defendants of their wind-down obligations under the License Agreement, including the requirement to provide an inventory statement after the expiration of the agreement. Defendants acknowledged receipt of the email and told H-D that MOD would adhere to the timeline H-D provided.

8.      Instead of the promised compliance and cooperation, Defendants abruptly stopped cooperating with H-D and failed to pay royalties it owed.

9.      Defendants also continued selling H-D-branded jewelry after the expiration of the license term in violation of H-D's trademark and copyright rights. Defendants have also begun

2

selling motorcycle-themed jewelry to H-D dealers in violation of MOD's non-solicitation obligations under the License Agreement and in many cases in connection with the H-D Marks and/or substantially and confusingly similar versions of the H-D Marks (including skulls, shields, and wings).

10.     H-D seeks injunctive and other relief, including without limitation an order enjoining Defendants from engaging in unlawful activities and awarding H-D past-due royalties, interest and late fees, statutory damages for counterfeiting, Defendants' profits, H-D's actual damages, and H-D's attorneys' fees and costs.

## THE PARTIES

11.     Plaintiff Harley-Davidson Motor Company, Inc. is a Wisconsin corporation having a principal place of business at 3700 West Juneau Avenue, Milwaukee, Wisconsin 53208.

12.     Defendant MOD Jewelry Group, Inc. is a Florida corporation having a principal place of business at 4228 NW 120th Avenue, Coral Springs, Florida 33065.

13.     Defendant Steel Horse Jewelry Inc. is a Florida corporation having a principal place of business at 4228 NW 120th Avenue, Coral Springs, Florida 33065.

14.     On information and belief, Defendant Len Weiss is an individual residing at 8880 Edgewater Place, Parkland, Florida 33076. Although Weiss's counsel has claimed that Weiss lives in Thailand, property records from Broward County, Florida reflect that this property is owned by Mr. Weiss and Chindarat Weiss, and that they receive the Homestead Exemption for property taxes on the property. Mr. Weiss's LinkedIn profile reflects that he is the CEO of MOD, and Florida Division of Corporations records reflect that he is the Director and President of MOD and that he is the President of Steel Horse. Both MOD and Steel Horse are headquartered in Florida.

3

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C.

§ 1121 (the Lanham Act), 17 U.S.C. § 101, *et seq*. (the Copyright Act), and 28 U.S.C. §§ 1331

and 1338(a) and (b) (federal question). This Court also has supplemental jurisdiction over

Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to its

federal claims that they form part of the same case or controversy and derive from a common

nucleus of operative fact. This Court also has subject matter jurisdiction pursuant to 28 U.S.C.

§ 1332 because there is complete diversity of citizenship as alleged in paragraphs 11-14 and the

amount in controversy exceeds $75,000, exclusive of costs, interest, and attorney's fees as

alleged in the Prayer for Relief.

16.    This Court has personal jurisdiction over Defendants, and venue is proper in this

District pursuant to 28 U.S.C. § 1391(b)(2). The license agreement provides that "[a]ny and all

disputes between the parties arising out of or related in any manner to this Agreement, including

but not limited to the Licensed Articles, Licensed Marks, Packaging, Promotional Materials, and

Royalties, must be brought, heard, and determined solely and exclusively in the United States

District Court for the Eastern District of Wisconsin or Milwaukee County Circuit Court for the

State of Wisconsin, except that Licensor has the right in its sole and exclusive discretion to take

legal action against Licensee in any other jurisdiction. All parties to this Agreement consent to

the personal and subject matter jurisdiction and venue of such courts and waive and relinquish all

right to attack the suitability or convenience of such venue or forum." Furthermore, Defendants

have directed certain acts in breach of the License Agreement at consumers in this District,

including by marketing products to H-D dealers in Milwaukee in violation of the License

Agreement. Defendants, furthermore, have caused harm to Plaintiff in this District.

4

## H-D, ITS PRODUCTS AND SERVICES, AND ITS TRADEMARKS

17.     Founded in 1903, H-D is a world-famous manufacturer of motorcycles and offers and sells a wide variety of other products and services, itself or through its licensees, including jewelry, riding bells, and other products.

18.     H-D's trademarks include, but are not limited to, the HARLEY-DAVIDSON, HARLEY, H-D, HD, HOG, and HARLEY OWNERS GROUP word marks, as well as the logos shown below including, but not limited to, H-D's Bar & Shield Logos, Number 1 Logos, and Willie G Skull Logos, and many others.



19.     H-D uses and has used the H-D Marks, including those discussed in the preceding paragraph, in connection with jewelry and bells for many years.

20.     For decades, H-D has offered and sold, itself and through its dealers and licensees, jewelry bearing the H-D Marks including, but not limited to, necklaces, bracelets,

5

4858-7774-4353

rings, earrings. Representative examples of H-D's jewelry products branded with the H-D Marks are shown below:



21.     The H-D Marks are premium brands and H-D has a reputation for providing a wide variety of high-quality merchandise under those brands itself and through its dealers and licensees. Given the incredible commercial success of H-D's motorcycle business over the years and its status for many years as a famous, iconic, and cult brand, there has long been a strong demand from motorcycle enthusiasts and the general public for products bearing the H-D Marks,

including jewelry. Consistent with its image as a premium brand, H-D positions its merchandise branded with the H-D Marks as high-quality merchandise at a premium price point.

22.     H-D, its products and services, and its H-D Marks have all received significant unsolicited media coverage for decades, including, for example, in national publications such as *Business Week*, *The Chicago Tribune, The New York Times, The Wall Street Journal, The Washington Post,* and *USA Today,* as well as in books, numerous national television programs and popular online publications and websites, such as MSNBC, CNN, and Yahoo.

23.     As a result of H-D's significant promotional efforts, commercial success, and popularity for decades, the HARLEY-DAVIDSON brand has been ranked annually for the past decade among the top 100 most valuable brands in the world by Interbrand, a leading independent branding firm. In 2019, Interbrand estimated the value of the HARLEY-DAVIDSON brand at US $4.79 billion. In 2020, Tenet Partners ranked the HARLEY-DAVIDSON brand as the 24th Most Powerful Brand in its Top 100 Most Powerful Brands report.

24.     Based on H-D's longstanding and extensive use of the HARLEY-DAVIDSON, HARLEY, H-D, HD, and Bar & Shield Logo marks, and the widespread advertising, publicity, promotion, and substantial sales of products and services under those marks, these marks have been well known and famous to both the general public and the motorcycling public for many years, and they have been recognized as such by various courts and other tribunals.

25.     Various federal courts, including the United States District Court for the Eastern District of Wisconsin, and the Trademark Trial and Appeal Board of the United States Patent and Trademark Office ("Board") have held that the H-D Marks, including HARLEY-DAVIDSON, HARLEY, H-D, HD, and the Bar & Shield Logo marks, are famous.

# H-D'S TRADEMARK REGISTRATIONS

26.     In addition to its longstanding and strong common-law rights in the H-D Marks,

H-D owns, among others, the following federal registrations for the H-D Marks:

| Mark | Reg. No.<br>Reg. Date | Goods and Services |
|---|---|---|
| HARLEY-DAVIDSON | 4771447<br>July 14, 2015 | House mark for a full line of jewelry in Class 14 |
| HARLEY-DAVIDSON | 1223355<br>Jan. 11, 1983 | Jewelry-namely, necklaces, pins, finger rings and earrings in Class 14 |
| HARLEY | 4955539<br>May 10, 2016 | Watches, rings, bracelets, necklaces, earrings, pins being jewelry; jewelry, namely, pendants, charms and ride beads for making jewelry in Class 14 |
| HD | 1654280<br>Aug. 20, 1991 | Jewelry, namely lapel pins, earrings, necklaces and bracelets in Class 14 |
| HARLEY OWNERS GROUP | 2143093<br>Mar. 10, 1998 | Clocks, watches, jewelry of precious and non-precious metal, namely pins and rings in Class 14 |
| HOG | 1716992<br>Sep. 15, 1992 | Watches, jewelry of precious and non-precious metal, namely, pins, charms, earrings, bracelets, necklaces, and rings; ornamental lapel pins; belt buckles of precious metal in Class 14 |
| | 4746463<br>June 2, 2015 | House mark for a full line of jewelry in Class 14 |
| | 1263936<br>Jan. 17, 1984 | Jewelry-namely, necklaces, rings, and key fobs in Class 14 |
| | 2376674<br>Aug. 15, 2000 | Jewelry in Class 14 |

8

| Mark | Reg. No. Reg. Date | Goods and Services |
|---|---|---|
| | 4771442<br><br>July 14, 2015 | A full line of jewelry in Class 14 |
| | 4528269<br><br>May 13, 2014 | Jewelry, namely, earrings, necklaces in Class 14 |
| | 3358093<br><br>Dec. 18, 2007 | Clocks, pins being jewelry, ornamental pins in Class 14 |
| | 3089507<br><br>May 09, 2006 | Watches, rings being jewelry, bracelets, necklaces, earrings, belt buckles of precious metal in Class 14 |
| | 1692178<br><br>Jun. 09, 1992 | Watches and jewelry pins in Class 14 |
| | 1224868<br><br>Jan. 25, 1983 | Key ring fobs in Class 14 |
| | 2344680<br><br>Apr. 25, 2000 | Rings, watches, jewelry pins in Class 14 |

9

| Mark | Reg. No. Reg. Date | Goods and Services |
|---|---|---|
| ![HOG logo] | 5105773<br><br>Dec. 20, 2016 | Jewelry of precious and non-precious metal, namely, ornamental lapel pins and jewelry pins for use on hats, charms, earrings, bracelets, necklaces and rings in Class 14 |
| ![Ladies of Harley logo] | 5467310<br><br>May 15, 2018 | Metal bells for motorcycles in Class 12<br><br>Jewelry, namely, pins in Class 14 |

27.     The federal trademark registrations listed above are incontestable, and thus constitute conclusive evidence of H-D's exclusive right to use those marks for the products and/or services specified in those registrations pursuant to 15 U.S.C. §§ 1065 and 1115(b).

### H-D'S COPYRIGHT REGISTRATION

28.     The Willie G. Skull Logo, shown below, was created by Willie G. Davidson, the son of former Harley-Davidson president William H. Davidson and the grandson of Harley-Davidson co-founder William A. Davidson, and Ray Drea.



29.     The Willie G. Skull Logo is an original work of authorship that constitutes copyrightable subject matter under U.S. law. H-D is the owner of all copyright rights in the Willie G. Skull Logo, all preexisting works containing the Willie G. Skull Logo, and all derivative works of the Willie G. Skull Logo. H-D owns U.S. Copyright Reg. No. VA 1-987-746, which issued on February 3, 2016. All rights in the Willie G. Skull Logo were assigned by H-D U.S.A., LLC to Plaintiff Harley-Davidson Motor Company, Inc. on December 31, 2022.

4858-7774-4353

30. The copyright registration for the Willie G. Skull Logo listed above is valid and subsisting. The copyright registration constitutes, in all instances, prima facie evidence of the validity of the copyright and the facts stated in the certificate.

## THE LICENSE AGREEMENT

31. H-D and MOD first entered into a nonexclusive trademark license agreement on January 1, 2011. H-D and MOD entered into subsequent nonexclusive trademark license agreement on January 1, 2014 that, as amended, expired December 31, 2017.

32. On January 1, 2018, H-D and MOD entered into the Nonexclusive Trademark License Agreement ("License Agreement") that is the subject of this lawsuit. The License Agreement was amended three times (in September 2019 ("Amendment 1"), October 2022 ("Amendment 2") and December 2022 ("Amendment 3")).

33. The License Agreement was originally set to expire on December 31, 2021, but was later extended to December 2022, and then again to December 2023.

34. Amendment 3, which extended the License Agreement for the 2023 term, states that "[t]he Term of the Agreement … is amended and extended for a period of (1) year, commencing January 1, 2023, and terminating on December 31, 2023, without the need for any other ratifying act, unless sooner terminated or modified in accordance with its terms." Amendment 3 § 2(a).

35. The License Agreement grants MOD "the nonexclusive right, during the Term, to use the Licensed Marks in the form specified in writing by Licensor only on and in connection with the manufacture, development, advertisement, marketing, and sale of the Licensed Articles to Authorized Retailers in the Territory, in each case subject to the terms, conditions and limitations set forth in this Agreement." License Agreement § 2.1. The License Agreement

11

further provides that MOD "has no right to use the Licensed Marks in any other manner or for any other purpose" and that "[a]ll rights not expressly granted to Licensee in this Agreement are reserved exclusively to Licensor." *Id.*

36.    The Licensed Marks refers to various identified H-D Marks, including HARLEY-DAVIDSON, HARLEY, H-D, HD, numerous variations of the Bar & Shield Logo, the Willie G Skull Logo, and others. *Id.* § 1.1, Ex. B.

37.    The defined term "Licensed Articles" in the License Agreement refers to jewelry products "with which the Licensed Marks are used and which are produced by or for Licensee as authorized by this Agreement." *Id.* § 1.1.

38.    The License Agreement provides that H-D owns "all copyrights, title, and interests in and to all artwork, photographs, archived images, copy, text, and other materials provided to Licensee by Licensor or its Affiliates under this Agreement, and ***of all things, works, materials, inventions, deliverables or elements directly or indirectly created, made or conceived ('Created Materials') under this Agreement***." *Id.* § 10.5 (emphasis added).

39.    The License Agreement provides that MOD is required to pay a percentage of its net sales of Licensed Articles, or alternatively a quarterly minimum payment, within 30 days after the end of each quarter (ending on March 31, June 30, September 30, and December 31). *Id.* § 3.1.

40.    Payments are due under the License Agreement "[n]o later than thirty (30) days after the end of each quarter," *id.* § 3.6(a), with quarters ending on March 31, June 30, September 30, and December 31 of each year, *id.* § 1.2(c).

41.    The License Agreement also provides for interest and penalties for late royalty payments. *Id.* § 3.6(b).

42.     The License Agreement also includes several terms regarding the post-expiration obligations of the parties.

43.     Upon expiration, among numerous other terms, MOD was required to cease using Licensed Marks and cease advertising, marketing, promoting, distributing, or selling Licensed Articles. *Id.* § 14.1.

44.     The License Agreement requires MOD to provide H-D with "with a written statement of the quantity and description of finished and work-in-process Licensed Articles, Promotional Materials, and Packaging in inventory" within ten business days of the last day of the License Agreement term. *Id.* § 14.2(a).

45.     The License Agreement provides for a 90-day sell-off period after the expiration or termination of the License Agreement. *Id.* § 14.2(b). However, the 90-day sell off period comes into effect "only if Licensee has timely delivered to Licensor its inventory statement." *Id.*

46.     Section 18.4 of the License Agreement (as amended by Amendment 2) obligates MOD not to solicit sales to H-D dealers for the term of the License Agreement and for two years thereafter. Specifically, it states: "By virtue of this Agreement and Licensee's status as a licensee of Licensor, Licensee is afforded unique access to Licensor's Dealers. Accordingly, Licensee agrees that during the Term of the Agreement and for two (2) years thereafter, Licensee shall not directly or indirectly solicit or influence any other party to offer for sale goods to Dealers, or any of their subsidiaries, Affiliates, or licensees as the case may be outside of the Licensed Articles authorized in this Agreement. As used herein, 'solicit' shall include, without limitation, requesting, encouraging, enticing, assisting, or causing, directly or indirectly. Notwithstanding the above, nothing in this provision shall be interpreted as restricting Licensee from carrying out its obligations under this Agreement."

13

## MOD'S BREACHES OF THE LICENSE AGREEMENT
## AND INFRINGEMENTS OF H-D's TRADEMARK AND COPYRIGHT RIGHTS

47. Throughout the parties' licensing relationship, H-D honored its obligations under the Licensing Agreement. MOD did not.

48. MOD made its last royalty payment, for the second quarter of 2023, on July 28, 2023.

49. On October 18, 2023, H-D informed MOD, via email to Weiss, that "Harley-Davidson does not intend to renew nor extend the term of Mod Jewelry's license Agreement beyond December 31, 2023." H-D asked MOD to review Section 14 of the License Agreement, which outlines post-expiration and sell-off requirements, and provided an overview of key dates for winding down the parties' relationship.

50. Weiss responded the same day, stating: "I can confirm receipt of your email and the timeline you have provided. I want to thank everyone at H-D on behalf of myself and MOD. We sincerely appreciate the extension to November 13th. The notification of non-renewal via DocuSign has already been sent to my attorney for review. I don't anticipate any problems. There should be no delay, and MOD will adhere to the timeline you sent."

51. Instead, MOD abruptly stopped cooperating with H-D.

52. MOD did not provide the inventory statement within ten days of the expiration of the term of the License Agreement.

53. MOD has not made any royalty payments to H-D since July 28, 2023.

54. Furthermore, MOD sold and offered for sale H-D-branded jewelry, including to H-D dealers, after December 31, 2023, in violation of the License Agreement and H-D's trademark rights.

14

55.     In fact, MOD salesman Hans Wohl emailed H-D dealers and falsely told them that MOD "is allowed to sell their stock until the end of June 2024 (was end of March 2024)." This was false for multiple reasons. H-D never extended the 90-day sell off period. In fact, MOD was never entitled to the 90-day sell off period in the first place because MOD never provided the inventory reports required by Section 14.2 of the License Agreement.

56.     In addition to selling H-D-branded jewelry after the expiration of the License Agreement, Defendants have sold and/or offered for sale motorcycle-themed jewelry to H-D dealers in violation of the License Agreement.

57.     In fact, Defendants traveled to Milwaukee in June 2024 during H-D's apparel and licensing ("A&L") show for H-D dealers. Defendants attempted to meet with H-D dealers during the A&L show for the purposes of selling them motorcycle-themed jewelry in violation of the License Agreement's non-solicitation clause.

58.     Defendants continue to sell jewelry bearing the H-D Marks and/or substantially and confusingly similar versions of the H-D Marks. For example, Defendants continue to sell jewelry bearing skulls, shields, and wings, sometimes together, as shown in the table below (and as compared to the H-D Marks/ Willie G. Skull Logo and licensed H-D jewelry bearing such marks and designs).



| H-D Marks | |
| Licensed H-D jewelry | |
| Infringing jewelry | |

59. Furthermore, many of the jewelry products sold by Defendants are Created Materials under the License Agreement, and therefore owned by H-D, because the designs for such products were "directly or indirectly created, made or conceived … under" the License Agreement.

## DEFENDANTS' ATTEMPTS TO SHIELD THEMSELVES FROM LIABILITY

60. Defendants have attempted to evade liability by engaging in a corporate shell game involving the creation of a new corporate entity to sell motorcycle-themed jewelry and, on information and belief, transferring MOD's assets to that new entity.

61. In 2023, well before H-D told MOD that H-D did not intend to renew the License Agreement for another term, MOD and Weiss took several actions in anticipation of selling motorcycle-related jewelry outside of, and in violation of, the License Agreement.

62. On information and belief, in February 2023, unbeknownst to H-D, MOD and Weiss registered the domain name https://steelhorsejewelry.com for the purpose of selling motorcycle-related jewelry to H-D dealers and others.

16

63.     On information and belief, in June 2023, unbeknownst to H-D, MOD and Weiss incorporated Steel Horse Jewelry Inc. in Florida for the purpose of selling motorcycle-related jewelry to H-D dealers and others.

64.     On information and belief, the formation of Steel Horse was intended solely to attempt to shield MOD and Weiss from liability for willfully breaching the License Agreement. Steel Horse was incorporated by Weiss in 2023 when MOD and Weiss apparently believed that H-D would not renew its License Agreement with MOD for another year and intended to cease making royalty payments to H-D in the event of the non-renewal.

65.     Defendants have represented to the public that Steel Horse is merely the continuation of MOD under a new name.

66.     For example, Defendants bill Steel Horse as "Steel Horse Jewelry *by MOD*," as shown below.



67.     Defendants also announced: "For over 20 years, MOD was a licensee of the iconic Harley-Davidson® brand, crafting jewelry that resonates with the heart and soul of the open road. That's how we cut our teeth. It was a wonderful experience, but now it's time to take it to the next level. We are thrilled to introduce Steel Horse Jewelry by MOD™, a bold new line born of our passion for adventure and infusing it into a broader canvas of lifestyle accessories built for any path. Steel Horse is the next generation of jewelry for all of life's adventures."

68.     A press release from Steel Horse announced that Steel Horse is MOD's "latest venture."

17

69.     According to Florida records, MOD and Steel Horse share a principal address of at 4228 NW 120th Avenue, Coral Springs, Florida 33065.

70.     Steel Horse also has facilities in Costa Mesa, California and Chiang Mai, Thailand at the exact same addresses as MOD's facilities.

71.     Florida records show that MOD and Steel Horse share a resident agent.

72.     MOD's website, modjewelry.com, redirects to steelhorsejewelry.com.

73.     Weiss runs both MOD and Steel Horse. Weiss's LinkedIn profile states that he is the CEO of MOD, and Florida records show that he is the Director and President of MOD and that he is the President of Steel Horse.

74.     MOD and Steel Horse also share employees. For example, Olivia Pistorio is listed as the Steel Horse contact person in a press release issued by Defendants. Ms. Pistorio was one of H-D's contacts at MOD during the licensing relationship between the parties. Furthermore, Steel Horse's sales representatives are also MOD sales representatives.

75.     When H-D attempted to collect its overdue royalty payments, MOD's counsel has not claimed that its breaches could somehow be excused or otherwise attempted to defend its actions. Rather, MOD's counsel has primarily asserted that MOD is "teetering on the steps of bankruptcy" and cannot pay.

76.     All of the facts listed above, among others, confirm that each of the Defendants identified above is the alter ego of each of the other Defendants. In doing the acts as alleged in this Complaint, each of the Defendants acted with the knowledge, permission, and the consent of each of the other Defendants, and each of the Defendants aided and abetted the other Defendants in the acts or omissions alleged in this Complaint.

18

## INJURY TO H-D AND THE PUBLIC

77.     Defendants' actions described above have damaged and irreparably injured and, if permitted to continue, will further damage and injure H-D, the H-D Marks, H-D's reputation and goodwill associated with those marks, H-D's reputation for high-quality products and services, and the public interest in consumers being free from confusion.

78.     Defendants' actions as described above have caused and are likely to continue to cause confusion, mistake, and deception as to the source or origin of the infringing products and have falsely suggested and are likely to continue to falsely suggest a sponsorship, connection, license, affiliation, or association between Defendants and/or the infringing products with H-D, the H-D Marks, and/or H-D's products and services.

79.     Defendants' actions described above are likely to dilute the distinctiveness of the H-D Marks, thereby injuring H-D.

80.     Defendants' actions described above have damaged H-D's ability to wind down the License Agreement, have damaged H-D's relationship with its current jewelry licensee, and have caused H-D to lose sales it would have made but for Defendants' violations.

81.     H-D has no adequate remedy at law.

82.     Defendants knew or should have known that their activities described above constituted trademark counterfeiting, trademark infringement, trademark dilution, and unfair competition, and thus Defendants acted knowingly and willfully in reckless disregard of H-D's rights in the H-D Marks.

### FIRST CLAIM FOR RELIEF
### Breach of Contract
### (Against All Defendants)

83.     H-D repeats and realleges each and every allegation set forth above.

84. The License Agreement is a valid and enforceable agreement between H-D and MOD, and, as a result of their alter ego status, the other Defendants.

85. H-D performed under the License Agreement including, but not limited to, by licensing MOD to use the H-D Marks in connection with jewelry.

86. Defendants breached the License Agreement in multiple ways including, but not limited to:

    a. By failing to pay royalties, interest, and late fees owed to H-D under Section 3 of the License Agreement;

    b. By failing to provide the inventory statement required under Section 14.2 of the License Agreement after the expiration of the term of the License Agreement;

    c. By using the H-D Marks after the expiration of the License Agreement in violation of the limited license under Section 2 of the License Agreement including, but not limited to, by selling and/or offering for sale Licensed Articles bearing the H-D Marks after December 31, 2023 despite having no right to the License Agreement's 90-day sell-off period, which required timely delivery of the inventory statement;

    d. By selling non-H-D-branded jewelry that was "directly or indirectly created, made or conceived … under" the License Agreement and that therefore constitutes Created Materials in which H-D owns "all copyrights, title, and interests in and to"; and

    e. By soliciting and/or influencing Steel Horse to offer for sale goods to H-D dealers outside of the Licensed Articles authorized in the License Agreement during the term of the License Agreement and/or within two years of the expiration of the

License Agreement in violation of Section 18.4 of the License Agreement (as amended by Amendment 2).

87.     As a direct and proximate result of Defendants' actions as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

**SECOND CLAIM FOR RELIEF**
**Tortious Interference with Contract**
**(Against Steel Horse and Weiss)**

88.     H D repeats and realleges each and every allegation set forth above.

89.     This claim is brought in the alternative, in the event that Steel Horse and/or Weiss are not deemed to be alter egos of MOD.

90.     H-D and MOD were parties to the License Agreement, which provides that "By virtue of this Agreement and Licensee's status as a licensee of Licensor, Licensee is afforded unique access to Licensor's Dealers. Accordingly, Licensee agrees that during the Term of the Agreement and for two (2) years thereafter, Licensee shall not directly or indirectly solicit or influence any other party to offer for sale goods to Dealers, or any of their subsidiaries, Affiliates, or licensees as the case may be outside of the Licensed Articles authorized in this Agreement. As used herein, 'solicit' shall include, without limitation, requesting, encouraging, enticing, assisting, or causing, directly or indirectly."

91.     MOD was thus prohibited from influencing "any other party" to offer goods to H-D dealers. On information and belief, Steel Horse and Weiss were aware of this contractual prohibition.

92.     Less than two years after the term of the License Agreement, Steel Horse offered for sale goods to H-D dealers based on the unique access to those dealers that MOD was afforded by virtue of the License Agreement and MOD's status as an H-D licensee.

21

93.     Therefore, to the extent Steel Horse is "any other party," and not an alter ego of MOD, MOD breached the License Agreement by influencing Steel Horse to offer goods to H-D dealers.

94.     Steel Horse thus interfered with MOD's contractual relationship with H-D by, on information and belief, inducing MOD to breach the License Agreement by causing MOD to assist Steel Horse with the sale of goods in violation of the non-solicitation clause. On information and belief, Weiss, as the individual in control of both MOD and Steel Horse, also interfered with the contractual relationship by facilitating this breach of contract.

95.     As a direct and proximate result of Defendants' actions as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

### THIRD CLAIM FOR RELIEF
### Trademark Counterfeiting Under Section 32(1)
### of the Lanham Act, 15 U.S.C. § 1114(1)
### (Against All Defendants)

96.     H-D repeats and realleges each and every allegation set forth above.

97.     H-D owns a number of federal trademark registrations for the H-D Marks for various goods and services, many including jewelry.

98.     Without H-D's consent, Defendants intentionally have used in commerce the H-D Marks and/or substantially indistinguishable variations or counterfeits thereof as defined under 15 U.S.C. § 1116(d)(1)(B)(i), in connection with the sale, offering for sale, and/or distribution of jewelry after the expiration of the License Agreement.

99.     Without H-D's consent, Defendants have reproduced, counterfeited, copied, and/or colorably imitated the H-D Marks, and applied such reproductions, counterfeits, copies, and/or colorable imitations to labels, signs, prints, packages, wrappers, receptacles, or advertisements, as defined under 15 U.S.C. § 1116(d)(1)(B)(ii), intended to be used in commerce

22

upon or in connection with the sale, offering for sale, distribution, or advertising of jewelry after the expiration of the License Agreement in a manner likely to cause confusion, or to cause mistake, or to deceive.

100.     Defendants' actions described above are likely to cause confusion, mistake, or to deceive as to the origin, sponsorship, or approval of the infringing products, MOD's and Weiss's services, and commercial activities, and thus constitute counterfeiting of H-D's federally registered H-D Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

101.     Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

102.     The actions of Defendants described above have at all times relevant to this action been willful and/or knowing.

103.     As a direct and proximate result of the actions of Defendants as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

104.     H-D has no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**
**Trademark Infringement Under Section 32(1)**
**of the Lanham Act, 15 U.S.C. § 1114(1)**
**(Against All Defendants)**

105.     H-D repeats and realleges each and every allegation set forth above.

106.     Defendants have used in commerce the H-D Marks and reproductions, copies, and colorable imitations thereof after the expiration of the License Agreement in connection with the offering, sale, distribution, and advertising of goods and services, which are likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of the infringing products, Defendants' products or services, and Defendants' commercial activities, and thus

23

constitute infringement of the H-D Marks referred to above in violation of Section 32 of the

Lanham Act, 15 U.S.C. § 1114.

107.  Defendants are directly, vicariously, and/or contributorily liable for the actions

described above.

108.  The actions of Defendants described above have at all times relevant to this action

been willful and/or knowing.

109.  As a direct and proximate result of the actions of Defendants as alleged above,

H-D has been and will continue to be damaged and irreparably harmed.

110.  Defendant Steel Horse is liable both directly and as an alter ego of MOD.

111.  H-D has no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**
**Trademark Infringement, False Designation**
**of Origin, and Unfair Competition**
**Under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)**
**(Against All Defendants)**

112.  H-D repeats and realleges each and every allegation set forth above.

113.  Defendants' actions described above are likely to cause confusion, mistake, or

deception as to the origin, sponsorship, or approval of the infringing products and MOD's and

Weiss's commercial activities, and thus constitute trademark infringement, false designation of

origin, and unfair competition with respect to the H-D Marks in violation of Section 43(a)(1)(A)

of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

114.  Defendants are directly, vicariously, and/or contributorily liable for the actions

described above.

115.  The actions of Defendants described above have at all times relevant to this action

been willful.

116.    As a direct and proximate result of the actions of Defendants as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

117.    Defendant Steel Horse is liable both directly and as an alter ego of MOD.

118.    H-D has no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**
**Trademark Dilution Under Section**
**43(c) of the Lanham Act, 15 U.S.C. § 1125(c)**
**(Against All Defendants)**

119.    H-D repeats and realleges each and every allegation set forth above.

120.    H-D has engaged in extensive nationwide advertising, promotion, and use of the HARLEY-DAVIDSON, HARLEY, H-D, HD, and the Bar & Shield Logo marks for many years. Further, H-D has had massive sales of goods and services bearing such marks for decades.

121.    The HARLEY-DAVIDSON, HARLEY, H-D, HD, and the Bar & Shield Logo marks have for many years received extensive unsolicited media attention nationwide. Such extensive and frequent media attention and commercial success has had a substantial impact on the public and has long created an association in the minds of consumers between H-D and the HARLEY-DAVIDSON, HARLEY, H-D, HD, and the Bar & Shield Logo marks , such that these marks are famous and were famous nationwide before Defendants commenced their unauthorized use of those marks after the expiration of the License Agreement.

122.    Defendants' actions described above, all occurring after the HARLEY-DAVIDSON, HARLEY, H-D, HD, and the Bar & Shield Logo marks became famous, are likely to cause dilution of the distinctive quality of those trademarks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

123.    Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

25

124.     The actions Defendants described above have at all times relevant to this action been willful.

125.     As a direct and proximate result of the actions of Defendants as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

126.     Defendant Steel Horse is liable both directly and as an alter ego of MOD.

127.     H-D has no adequate remedy at law.

**SEVENTH CLAIM FOR RELIEF**
**Copyright Infringement**
**<u>17 U.S.C. § 101, et seq.</u>**
**(Against All Defendants)**

128.     H-D repeats and realleges each and every allegation set forth above.

129.     H-D's Willie G. Skull Logo is a wholly original work of authorship and constitutes copyrightable subject matter under the Copyright Act of 1976, 17 U.S.C. § 101 et seq.

130.     H-D is the sole owner of all right, title, and interest in and to the copyright in the Willie G. Skull Logo.

131.     H-D has complied in all respects with the Copyright Act of 1976 (17 U.S.C. § 101 et seq.) and has received from the Registrar of Copyrights Certificate of Copyright, Registration No. VA 1-987-746 for the Willie G Skull Design. The Certificate of Registration constitutes prima facie evidence of the validity of H-D's copyright rights and the facts stated in the Certificate.

132.     After the expiration of the License Agreement, H-D has not licensed, or in any other way authorized, Defendants to reproduce, cause to reproduce, prepare derivative works from, distribute, or display any portion of the Willie G. Skull Logo, which are the exclusive rights of H-D as the copyright owner.

26

133.     By the actions described above, Defendants have infringed and will continue to infringe H-D's copyright rights in the Willie G. Skull Logo in violation of the Copyright Act, 17 U.S.C. § 101, et seq.

134.     The actions of Defendants described above have at all times relevant to this action been willful.

135.     As a direct and proximate result of the actions of Defendants as alleged above,

136.     H-D has been and will continue to be damaged and irreparably harmed.

137.     Defendant Steel Horse is liable both directly and as an alter ego of MOD.

138.     H-D has no adequate remedy at law.

**EIGHTH CLAIM FOR RELIEF**
**Common Law Trademark Infringement, Unfair**
**Competition, and Misappropriation**
**(Against All Defendants)**

139.     H-D repeats and realleges each and every allegation set forth above.

140.     Defendants' actions described above with respect to the H-D Marks constitute common law trademark infringement, unfair competition, and misappropriation of H-D's goodwill under the common law.

141.     Defendants are directly, vicariously, and/or contributorily liable for the actions described above.

142.     The actions of Defendants described above have at all times relevant to this action been willful.

143.     As a direct and proximate result of the actions of Defendants as alleged above, H-D has been and will continue to be damaged and irreparably harmed.

144.     Defendant Steel Horse is liable both directly and as an alter ego of MOD.

145.     H-D has no adequate remedy at law.

27

# PRAYER FOR RELIEF

WHEREFORE, H-D prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

A.    An injunction preliminarily and permanently enjoining Defendants and their employees, agents, partners, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, distributors, dealers, retailers, wholesalers, manufacturers, vendors (including without limitation ISPs, printers, and order fulfillment and shipping vendors), successors, assigns, sellers of products on any and all websites and social media pages owned, operated, or controlled by Defendants, and all other persons in active concert or participation with any of them:

1.    From breaching any of the terms of the License Agreement;

2.    From using, displaying, and/or registering the H-D Marks in any form, manner, or medium including but not limited to in connection with any other wording or designs, and from using any other marks, logos, designs, designations, or indicators that are confusingly similar to any of the H-D Marks, or likely to dilute the distinctiveness of or tarnish any of the H-D Marks, in any unauthorized manner including, but not limited to: (a) use on or in connection with any products of any type in any online or offline context, including without limitation the infringing products, Defendants' websites and any other online venue; (b) on any designs to be applied to products, including without limitation all artwork, transparencies, negatives, dies, tooling, molds, screens, disks, and other materials; (c) on any packaging, containers, tags, labels, product inserts, order documents, shipping documents, and invoices associated or used with any of the items in subparts (a) and (b) above; (d) any other websites or online platforms including social media and apps, promotional and advertising materials, store names, signage, and product

28

packaging and labeling; and (e) as or as part of any trademarks, business names, corporate names, store names, seller names on Defendants' websites, product names on Defendants' websites, domain names, e-mail addresses, URLs, metatags, metadata, screen names, social media names, keywords such as advertising keywords, or any other names or identifiers;

3.     From using or displaying in any form or manner any images or pictures of the infringing products including, but not limited to, use and display in any advertising, marketing, and promotional materials, on Defendants' websites, on any other online or offline venue used to display, advertise, market, or promote the infringing products;

4.     From fulfilling any orders for any infringing products at any time;

5.     From making any unauthorized use or display of the H-D Marks and any other trademarks of H-D or confusingly similar marks in any form, manner, or medium in any advertising, promotional, or marketing of the infringing products or other products or services, including on Defendants' websites, on or in any advertisements, promotional materials, advertising materials, catalogs, brochures, flyers, coupons, giveaway items, third-party websites, social media sites, store names, names of sellers on Defendants' websites, and signage;

6.     From representing by any means whatsoever, directly or indirectly, that Defendants or any products or services offered by Defendant, including without limitation the infringing products, or any activities undertaken by Defendant, emanate from H-D, or are authorized, licensed, or otherwise affiliated with or sponsored or endorsed by H-D; and

7. From assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs A.1-6 above.

B. An Order directing Defendants to destroy all products and items in his possession or under his control that bear the H-D Marks, including without limitation any infringing products and all items bearing the H-D Marks, and to confirm such destruction in writing to H-D, and to provide to H-D the identity and complete contact information and payee information for all persons and entities that made, produced, advertised, sold, or designed the infringing products including, but not limited to, sellers, manufacturers, printers, shipping vendors, wholesalers, distributors, retailers and all others that assisted or enabled Defendants to make, advertise, promote, sell, distribute, and transport the infringing products.

C. An Order requiring Defendants to pay H-D the cost for corrective advertising and/or to engage in corrective advertising in a manner directed by the Court.

D. An Order directing Defendants to file with this Court and serve on H-D's attorneys, thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which they have complied with the injunction and other orders issued by the Court.

E. An Order requiring Defendants to pay royalties owed under the License Agreement, plus interest and late fees;

F. An Order requiring Defendants to pay statutory damages in accordance with 15 U.S.C. § 1117(c) of $2,000,000 per mark per type of product or service sold, offered for sale, or distributed by Defendants bearing marks deemed to be willful counterfeits of the H-D Marks;

G. An Order requiring Defendants to account for and pay to H-D any and all profits arising from the foregoing acts of counterfeiting, infringement, dilution, false designation of

origin, and unfair competition, and an increasing of such profits for payment to H-D in accordance with 15 U.S.C. § 1117, and other applicable statutes and laws;

H.     An Order requiring Defendants to pay H-D compensatory damages in an amount as yet undetermined caused by the foregoing acts of counterfeiting, infringement, dilution, false designation of origin, unfair competition, and trebling such compensatory damages for payment to H-D in accordance with 15 U.S.C. § 1117, and other applicable statutes and laws;

I.     An Order requiring Defendants to pay statutory damages in accordance with 17 U.S.C. § 504 in an amount of $150,000 per work deemed to be willfully infringed;

J.     An Order requiring Defendants to pay H-D punitive damages in an amount as yet undetermined caused by the foregoing acts of Defendant;

K.     An Order requiring Defendants to pay H-D's costs and attorney's fees in this action pursuant to 15 U.S.C. § 1117, 17 U.S.C. § 505, and other applicable statutes and laws; and

L.     Other relief as the Court may deem appropriate.

Plaintiff demands a jury trial on all issues so triable.

Dated: September 4, 2024

Respectfully submitted,

 /s/Matthew D. Lee
Matthew D. Lee (WI Bar No. 1031678)
**FOLEY & LARDNER LLP**
150 E. Gilman Street, Suite 5000
P.O. Box 1497
Madison, WI 53701-1497
Tel: (608) 258-4203
Fax: (608) 258-4258
mdlee@foley.com

David M. Kelly (WIED Bar No. 409718)
Saul Cohen (WIED Bar No. 1044818)
**KELLY IP, LLP**
1300 19th Street, N.W., Suite 420
Washington, D.C. 20036
Tel: (202) 808-3570
Fax: (202) 354-5232
david.kelly@kelly-ip.com
saul.cohen@kelly-ip.com

*Counsel for Plaintiff Harley-Davidson Motor Company, Inc.*